**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHAD HANSEN and MELISSA HANSEN, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | 18 CV 244 |
| | ) | |
| vs. | ) | Magistrate Judge Jeffrey Cummings |
| | ) | |
| COUNTRY MUTUAL INSURANCE CO. d/b/a COUNTRY FINANCIAL and ELITE CONSTRUCTION CO. INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Chad and Melissa Hansen have filed a renewed motion to compel the production of documents and to allow an inspection/use of the XactAnalysis software of defendant Country Mutual Insurance Company ("CMIC") (Dckt. #160) and an accompanying motion to modify the discovery schedule and the motion for class action briefing schedule (Dckt. #175). The parties disputed the degree to which CMIC complied with this Court's September 28, 2020 ruling (hereinafter, the "Order") in their briefing concerning the renewed motion to compel. To facilitate a resolution of the renewed motion, the Court entered a January 6, 2021 order (Dckt. #178) directing CMIC to file a supplemental memorandum to address the contested matters. After CMIC filed its supplemental memorandum (Dckt. #179), plaintiffs filed a motion for leave to file a short document addressing representations in defendant's supplemental memorandum (Dckt. #180). As will be explained, plaintiffs' renewed motion to compel is granted to the limited extent specified below. Plaintiffs' motions to modify the class action

1

briefing schedule and for leave to file a short document in response to CMIC's supplemental memorandum are also granted.

## A. Plaintiffs' Renewed Motion To Compel

Plaintiffs bring this putative class action alleging that CMIC engaged in multiple acts of breach of contract, common law fraud, consumer fraud and deceptive business practices, unreasonable and vexatious claims practices, negligence, and conversion. As this Court explained in its Order on plaintiffs' most recent motion to compel, discovery in this case has been on-going for more than two years and CMIC has expended significant effort and produced a massive amount of material in response to plaintiffs' discovery requests. (Dckt. #144 at 1-2.) CMIC also certified its compliance with the Order with a ten-page statement supported by the sworn declarations of its Director of Property Claims (John Butkus) and its XactAnalysis Account Manager (Gary Kiester). (Dckt. ##147, 147-1, 147-2.)

In their renewed motion to compel, plaintiffs – in reliance on their outdated and overly expansive view of the appropriate scope of discovery under Federal Rule of Civil Procedure 26[1] – challenge CMIC's compliance with this Court's prior ruling and their discovery requests as a whole. Specifically, plaintiffs assert that the Court should order CMIC to: (1) grant plaintiffs access to CMIC's XactAnalysis software for inspection and use; (2) produce ESX files from CMIC's sample claim forms to the extent that they reside on CMIC's network or in Veriskk's

---

[1] Although plaintiffs cite the current version of Rule 26, they mistakenly rely on caselaw that predates the 2015 amendments to the Rule to construe it. (*See* Dckt. #160 at 2-3.) Courts have rejected this approach. *See, e.g., Alexander v. 1328 Uptown, Inc.,* No. 18-CV-1544 (ECT/ECW), 2019 WL 4929931, at *3 (D.Minn. Oct. 7, 2019); *Bonanza Beverage Co. v. Millercoors, LLC,* No. 218CV01445JADGWF, 2019 WL 302491, at *3 (D.Nev. Jan. 23, 2019). As presently drafted, "[t]he discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest" and parties are instead "entitled to a reasonable opportunity to investigate the facts – and no more." *Motorola Sols., Inc. v. Hytera Communications Corp.,* 365 F.Supp.3d 916, 925 (N.D.Ill. 2019) (internal quotation marks omitted).

cloud; (3) produce all Xactimate and Xactcontents macros and certify compliance; (4) produce the remaining document it asserts is protected by the attorney-client privilege in unredacted form; and (5) produce its unprivileged internal policy, procedure, and practice documents from June 2016 through the present.

CMIC reports that Verisk can produce an additional field of XactAnalysis data[2] that it previously believed could not be captured and it represents that it will produce this data to plaintiffs "in short order" as soon as it receives the data from Verisk. (Dckt. #179 at 1.) CMIC does not oppose an extension of the expert discovery deadlines so that plaintiffs' experts can incorporate this additional data into their analyses. (Dckt. #179 at 1, 4 n.6.) The parties also agree that CMIC has all ESX files in Verisk's cloud regardless of the date of the files. (Dckt. #179 at 5; Dckt. #180 at 1.) CMIC otherwise opposes plaintiffs' renewed motion to compel.

**1.    Plaintiffs are not entitled to access, inspect, and use CMIC's XactAnalysis Software**

Plaintiffs renew their assertion that the Court should permit them to access, inspect, and use CMIC's XactAnalysis software based on their claim that CMIC has, in several respects, failed to comply with the Order. The Court disagrees for the following reasons.

**a.    CMIC and Verisk have (with one exception) produced the accessible XactAnalysis data sought by plaintiffs**

In its Order, this Court reiterated Judge Pallmeyer's prior ruling that CMIC should work with Verisk to produce the underlying XactAnalysis data so that plaintiffs could retain an expert to analyze the data. Specifically, this Court ordered the parties to schedule a conference call between themselves and Verisk so that plaintiffs could clearly identify the data that they were seeking and the data could be promptly produced to them. (Dckt. #144 at 4.) The parties agree

---

[2] The data field in question is titled "Additional text/notes by adjuster." (Dckt. 179-1 at 3.)

that CMIC complied with the Court's Order by facilitating two calls between plaintiffs and Verisk. The parties further agree that: (1) plaintiffs made an eight-page written request for Verisk to produce a "large amount of [XactAnalysis] data" (Dckt. #168 at 23);[3] (2) Verisk produced a volume of XactAnalysis data to CMIC in response to plaintiffs' request; and (3) that CMIC in turn produced the data to plaintiffs.

Plaintiffs nonetheless assert that they are entitled to access CMIC's XactAnalysis software because Verisk did not produce the majority of the data requested by them, including data related to price deviations and estimate deviations, and the data Verisk failed to produce is available to CMIC through its XactAnalysis software. (Dckt. #160 at 5 n.2; Dckt #171 at 3, 7 n.10; Dckt. #180-1 at 1-3.) CMIC strongly disputes plaintiffs' assertions.

In particular, in CMIC's supplemental memorandum and the accompanying declaration of Brent Francom (who is the Assistant Vice President with XactAnalysis at Xactware Solutions, Inc., a Verisk Analytics Company), CMIC addressed each of the data fields or category of data that plaintiffs claim that CMIC failed to produce. (*See* Dckt. #179 at 1-4; Dckt. #179-1 at 2-6.) CMIC explained that the remaining XactAnalysis data fields sought by plaintiffs were not produced for one or more of the following reasons: (1) the data field requested does not exist; (2) the data field requested is not tracked or stored; (3) the data field requested "is not an extractable field that exists as a data point and cannot be determined without [Verisk] performing a

---

[3] In their attorney's October 9, 2020 submission, plaintiffs requested that Verisk produce numerous fields of XactAnalysis data pertaining to topics including Xactimate Estimates, Estimate Totals, XactContents Estimates, Estimate Collaboration Summary, Estimate Collaboration Reasons, Estimate Correction Summary, Contents Cost Comparison Report, Estimate Audit Results, Supplements & Corrections by Reason, Timely Estimate Variance, Labor Efficiencies Usage, Changes to Price List Items, Price List Items by Quality, Items Changed by Adjuster, Claim Life Cycle, Measured Goals, and Personal Rules. (Dckt. #168 at 23-30.) Although plaintiffs acknowledged that they "request[ed] data that may seem irrelevant," they refused to narrow the scope of their requests. (Dckt. #168 at 23.)

calculation" and "creating a total;" or (4) with respect to the "S. Waste" data field, "[t]he data file would be extremely large due to the amount of individual line items contained in each estimate." (Dckt. #179 at 4; Dckt. #179-1 at 4-6.)

Although plaintiffs characterize CMIC's reasons for not producing the data fields as "dishonest" (Dckt. #180-1 at 1), they have provided no evidence to contradict the sworn testimony of Francom. Consequently, the Court credits Francom's testimony and finds that CMIC – with one exception – has offered satisfactory reasons for not producing the remaining data fields sought by plaintiffs. The one exception concerns the "S. Waste" data field. Francom explained that

> [t]o the extent that [plaintiff's counsel] intended to request 'Waste' via each individual line item as opposed to 'Total Waste' on a claim estimate level as is understood by XactAnalysis, XactAnalysis can endeavor to obtain this information.[4] [However,] [t]he data file would be extremely large due to the amount of individual line items contained in each estimate.

(Dckt. 179-1 at 4.) Thus, Francom did not state that the waste data described above cannot be produced; rather, he implies that Verisk did not produce this data because the data file would be "extremely large." (Dckt. 179-1 at 4.) While the sheer volume of responsive data could provide a valid basis for non-production if the effort to produce the data would create an undue burden, CMIC does not assert that production of the waste data in question would create such a burden. Accordingly, the Court will order CMIC to obtain the waste data referenced above from Verisk and produce it to plaintiffs by February 16, 2021.

---

[4] Francom further explained that "'Waste' is not a value that is stored by XactAnalysis as a total on a claim estimate level but is instead only stored on a line item level. Therefore, total waste is not an extractable field that exists as a data point and it cannot be determined without performing a calculation of each line item and creating a total." (Dckt. #179-1 at 4.)

### b. CMIC has produced the XactAnalysis data to plaintiffs in a reasonably usable form as defined by Rule 34

Plaintiffs next assert that they are entitled to access CMIC's XactAnalysis software because there were issues with formatting which prevented a clean import of the XactAnalysis data and created a multitude of data-related errors (82,871 to be precise). (Dckt. #160 at 5, 7.) According to plaintiff, these errors have prevented them from searching the data by electronic means (Dckt. #160 at 7)[5] and the data is therefore not in a "reasonably usable form" as defined by Rule 34. *See, e.g., Johnson v. Italian Shoemakers, Inc*., No. 317CV00740FDWDSC, 2018 WL 5266853, at *2 (W.D.N.C. Oct. 23, 2018) (ESI is produced in a "reasonably usable form" under Rule 34 when it is "searchable and/or sortable by metadata fields") (citing cases). Plaintiffs further assert that the unusable nature of the data as produced entitles them to inspect the full XactAnalysis database on CMIC's computers to run scripts and pull the relevant data for themselves. (Dckt. #171 at 7-8, *quoting Mervyn v. Atlas Van Lines, Inc.,* No. 13 C 3587, 2015 WL 12826474, at *6 (N.D.Ill. Oct. 23, 2015).)

In its supplemental memorandum, CMIC disputes plaintiffs' claim that the XactAnalysis data it produced is not in a "reasonably usable form." In particular, CMIC asserts that: (1) it "produced to [p]laintiffs' counsel the exact data, in form and substance, that it received from XactAnalysis;" (2) the data provided from XactAnalysis was "provided in a CSV file that is searchable and sortable;" (3) the data can be uploaded into a database program and/or data analytical program and used by the user as desired; and (4) CMIC opened the CSV files using an Excel program and confirmed that the files could be sorted and filtered by the data provided

---

[5] Plaintiffs retreated somewhat from this assertion in their most recent filing where they acknowledge that the XactAnalysis data can be uploaded into Tableau and Excel and they admit that it is possible to conduct meaningful searches on the data by excluding the improperly formatted rows (which are 16% of the total). (Dckt. #180-1 at 3-4.)

within the spreadsheet.  (Dckt. #179 at 4-5.)  In light of this, and plaintiffs' concessions (*supra,* at fn.5), the Court finds that CMIC has produced the XactAnalysis data in a reasonably usable form as required by Rule 34.[6]

The Court further finds that plaintiffs have been able to conduct meaningful searches through the XactAnalysis data notwithstanding the errors that they have identified.  In particular, page six of plaintiffs' reply states:

> Plaintiffs have alleged that CMIC misuses Xactimate and XactContents (the two estimating software programs that XactAnalysis collects data from) to intentionally undervalue claims.  One example of this is CMIC's instruction to its adjusters to simply depreciate items by age and assuming average conditions. . . . The data produced by Verisk – even in its damaged condition – confirms that CMIC's adjusters are largely following this instruction (which is a breach  of CMIC's explicit contractual obligation regarding how it will determine depreciation in the event of a loss).

(Dckt. #171 at 9.)  Plaintiffs further assert that "[t]his is just the tip of the iceberg in terms of what [they] have found in the data from Verisk" and that the data "puts to rest CMIC's assertion that Plaintiffs' claims are 'unproven,' 'unsupported,' [and] 'unsubstantiated.'" (Dckt. #171 at 9 n.9.)

### c.    Plaintiffs are not entitled to access CMIC's XactAnalysis database

The Court rejects plaintiffs' assertion that they should be granted access to CMIC's XactAnalysis database to conduct their own searches for the following reasons.  First, this Court

---

[6] The principal case relied upon by plaintiffs is factually distinguishable because the producing party took ESI that was text searchable with associated metadata, rendered it non-searchable by converting it into TIFF images without metadata, and thereby failed to  produce the ESI in a "reasonably usable form" as required by Rule 34.  *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 585–87 (M.D. Fla. 2009), *aff'd in part, quashed in part*, No. 607CV-0222ORL-35KRS, 2009 WL 5606058 (M.D. Fla. Nov. 16, 2009).  CMIC took no such actions here.  Furthermore, there is no evidence that either Verisk or CMIC took any steps to "either destroy or disable the [data's] ability to be searched."  *Covad Commc'ns Co. v. Revonet, Inc.*, 260 F.R.D. 5, 9 (D.D.C. 2009) ("The cases interpreting Federal Rule of Civil Procedure 34 conclude that it is therefore improper to take an electronically searchable document and either destroy or degrade the document's ability to be searched") (citing cases).

has already considered and denied plaintiffs' request for access to CMIC's database and the Court adheres to that ruling for the reasons stated in the Order. (Dckt. 144 at 5-6.) Second, plaintiffs – who blithely assert that allowing them to search CMIC's database would be analogous to what this Court does whenever it logs onto Westlaw or Lexis (Dckt. 171 at 8) – fail to rebut the sworn testimony from CMIC's Director of IT Services regarding how providing plaintiffs with access to CMIC's XactAnalysis software would be unduly intrusive to CMIC's business. (Dckt. #168 at 10 n.6 (citing Dckt. #70-7).)

Finally, the case that plaintiffs rely upon (*Mervyn v. Atlas Van Lines, Inc. supra*), is distinguishable. In *Mervyn,* the plaintiff sought to compel defendant to produce certain shipping data and defendant objected on the ground that it would have to create a new computer code to retrieve the data to produce it for plaintiff. *Mervyn,* 2015 WL 12826474, at *5. The court, after finding that defendant did not "provide any alternative avenue for [p]laintiff to obtain this data," ordered defendant to query its database to produce a report containing the data. *Id.* at 6. In this case, by contrast, CMIC has produced (or has been ordered to produce) the XactAnalysis data sought by plaintiffs to the extent that it can be produced. Thus, the rationale that prompted the *Mervyn* defendant to query its database to produce a report with the data sought by plaintiff is not present here. Furthermore, the *Mervyn* court did not order the defendant to grant plaintiff access to search defendant's internal database, which is the relief plaintiffs seek here.

### 2. CMIC has complied with this Court's Order regarding the production of Xactimate Macros

In its certification of compliance with the Order and its response to plaintiffs' renewed motion to compel, CMIC asserts that it has fully complied with that portion of the Order that directed CMIC to produce Xactimate Macros. In particular, CMIC: (1) produced additional Macros, including all formal, training-issued Macros created by CMIC for use in adjusting

claims; (2) conferred with plaintiffs' counsel to provide the Macros in a form that plaintiffs could view; (3) searched for and produced additional Macros from drives within its system that plaintiffs claimed contained Macros; (4) searched custodian files, drives, and the universe of all documents collected (323,633 in total) for the term "Macro" and produced additional documents; and (5) provided a Rule 30(b)(6) witness who was questioned by plaintiffs regarding "Macros." (Dckt. #147 at 8-9).

Plaintiffs do not dispute that CMIC took the above actions. Nonetheless, plaintiffs assert that CMIC failed to comply with the Order because it avowedly "withheld 'Macros' that were contained in a 'technical support' file created for the purpose of providing technical support relative to the Xactimate estimating program and not for training within CMIC." (Dckt. #147 at 9; Dckt. #171 at 16-17.) CMIC asserts that these Macros were not within the scope of the Court's Order, and the Court agrees. The Xactimate Macros that plaintiffs sought through their prior motion to compel and that the Court ordered CMIC to produce were those pertaining to *training* that were discussed during the deposition of CMIC's Supervisor of Claims Training Bradley Keck. (*See* Dckt. #144 at 10, *quoting* Dckt. #135 at 12 (citing to Dckt. #119-18 at 10 & Dckt. #119 at Ex. U (Keck dep.), p. 54:14-20).) The Court's Order did not direct CMIC to produce Macros that were contained in a technical support file and it does not appear that plaintiffs moved to compel CMIC to produce these Macros in their prior motion to compel.

Finally, although plaintiffs now seek the production of the Macros within the "technical support" file, plaintiffs have offered no explanation as to how these documents are relevant to the parties' claims or defenses. *See* Fed.R.Civ.P.26(b)(1) ("[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"); *Motorola Sols., Inc. v. Hytera Communications Corp.,* 365 F.Supp.3d 915, 924 (N.D.Ill. 2019) ("Relevance focuses

on the claims and defenses in the case, not its general subject matter"). Because plaintiffs have failed to make a showing that this additional discovery is relevant and proportional to the needs of the case in light of the voluminous discovery already produced by CMIC, *see Sanchez v. City of Fort Wayne,* No. 118CV00397HABSLC, 2019 WL 6696295, at *2 (N.D.Ind. Dec. 9, 2019), the Court will not order CMIC to produce the Macros within the technical support file. *See also Motorola Sols.,* 365 F.Supp.3d at 925 ("The discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest").

### 3. CMIC must produce a revised version of the March 2010 Storm meeting notes that redacts only legal advice rendered by its in-house attorneys to its claims personnel

During the course of discovery, CMIC produced a redacted version of a nine-page document titled "Storm meeting notes – March 2010" (Country Mutual – 044567 – 044575). CMIC asserts that it redacted portions of this document in reliance on its attorney-client privilege to protect legal advice that was given to CMIC's claims personnel by CMIC in-house attorneys Wendy Schafer (then acting head of litigation in the Office of General Counsel) and James Carlson (then senior litigation claims attorney). (Dckt. #168 at 12.) CMIC further asserts that its attorneys advised its claims personnel "regarding the company's legal obligations for file retention generally, as well as the proper protocols for complying with legal hold notices, protecting the confidentiality of privileged legal advice, documenting facts in anticipation of litigation, and applying policy language." (*Id.*) Plaintiffs challenge CMIC's invocation of its attorney-client privilege and assert that the CMIC's attorneys' advice actually concerned "business practices and procedures and informing CMIC's personnel of regulatory requirements." (Dckt. #171 at 18.)

It is true that courts do not presume that communications between in-house counsel and corporate personnel are protected by the attorney-client privilege. *See, e.g., Smith v. Board of Education of City of Chicago,* No. 17 C 7034, 2019 WL 2525890, at *1 (N.D.Ill. June 19, 2019) (citing cases). Moreover, courts have made it clear that business and financial advice provided by in-house counsel is not privileged. *Id.* Nonetheless, it is equally clear that advice rendered by an in-house attorney who is acting as a legal advisor is covered by the attorney-client privilege. *Id.*

CMIC has provided an unredacted copy of the Storm meeting notes to the Court for an *in camera* review. The Court finds that the document was appropriately redacted to protect legal advice covered by CMIC's attorney-client privilege with the exception of two unnecessary redactions that concern business advice. The first redaction is on page six of nine beginning with the thirteenth line of text through the end of the page. The second redaction is on page seven of nine beginning with the thirteenth line of text through the eighteenth line of text. The Court orders CMIC to provide plaintiffs with a revised version of the Storm meeting notes document that eliminates these two redactions by February 5, 2021.

### 4. CMIC need not produce any further otherwise responsive documents that were created after the filing of the Grundy County action on June 15, 2016

Plaintiffs, whose home was severely damaged by a tornado on June 22, 2015, filed this lawsuit against CMIC on January 12, 2018. In mid-November 2018, the parties reached an agreement (the "Agreement") regarding the production of documents that is embodied in a November 13, 2018 email sent from CMIC's counsel to plaintiffs' counsel, which states:

> we agreed that for all documents that are responsive to either side's discovery requests but were created after the filing of the Grundy County action,[7] the parties need not produce such materials or identify them on a privilege log (if they are subject to the attorney-client privilege or work product doctrine). This category

---

[7] The Grundy County action was filed on June 15, 2016.

11

> includes your communications with your clients related to your retention, which we confirm consistent with this agreement, do not need to be produced or logged. The only exception to this agreement applies to materials related to the on-going adjustment of the Hansen's claim for coverage, which will be produced even if they extend beyond the post-litigation date.

(Dckt. #160-10 (Ex. M).)  CMIC produced over 30,000 pages of documents, including its training policy and procedure documents and including materials that were created *after* the Grundy County action was filed,[8] prior to mid-November 2018 when they entered into the Agreement.  (Dckt. #168 at 18-19.)

The parties now dispute the scope of the Agreement.  Plaintiffs assert that the Agreement only applies to "privileged" documents that were created after the Grundy County action was filed and that CMIC therefore must produce all non-privileged policy, procedure, and practice documents that were created after mid-June 2016.  Alternatively, plaintiffs ask the Court to enter an order barring CMIC from relying upon any such documents it does not produce in later stages of this litigation and at trial pursuant to Rule 37(c)(1)(C).  CMIC asserts that the Agreement applies to *all* documents – privileged or not – that were created after mid-June 2016.

A plain reading of the e-mail text demonstrates that CMIC has properly interpreted the Agreement.  First, the Agreement applies to "*all* documents that are responsive to either side's discovery requests but were created after the filing of the Grundy County action."  (emphasis added).  Second, the Agreement states that "the parties need not produce such materials *or* identify them on a privilege log."  (emphasis added).  If the Agreement only applied to privileged documents, the first part of the above clause would be superfluous because a party would not knowingly produce privileged materials.  Finally, the Agreement makes an "exception" for material related to the on-going adjustment of plaintiffs' claim for coverage.  Most, if not all, of

---

[8] Plaintiffs used one of the post-June 2016 policy documents that CMIC produced prior to the Agreement during the October 27 and 28, 2020 Rule 30(b)(6) deposition of CMIC.  (Dckt. #168 at 20.)

the documents related to the on-going adjustment of plaintiffs' claim would not be covered by the attorney-client or work product privileges. Consequently, if the Agreement only applied to privileged documents, there would be no need for the Agreement to carve out this exception. For these reasons, the Court finds pursuant to the parties' Agreement that CMIC has no obligation to produce its unprivileged internal policy, procedure, and practice documents that were created after June 15, 2016.

The Court also declines in its discretion to relieve plaintiffs of the consequences of the Agreement. *See Giles v. United Airlines, Inc.,* 95 F.3d 492, 495 (7th Cir. 1996) (the district court has discretion to decide the scope of discovery and resolve discovery disputes). Plaintiffs admit that they became aware of CMIC's interpretation of the Agreement on June 12, 2020. (Dckt. #171 at 19.) Despite this, plaintiffs did not raise this dispute regarding the Agreement until more than five months later when they filed their renewed motion shortly after fact discovery was then scheduled to close. Plaintiffs provide no justification for this lengthy delay in raising this issue. Moreover, plaintiffs acknowledge that allowing them to obtain the additional documents they seek "will likely necessitate a substantial elongation of fact discovery." (Dckt. #160 at 14.) Given the significant volume of discovery that has already been exchanged (including, as stated above, CMIC's policy documents that were created after mid-June 2016 but were produced to plaintiffs prior to the Agreement) and the amount of time that the parties have already spent engaging in discovery, the further delay forecasted by plaintiffs would be unacceptable.

**B.      Plaintiffs' Motion To Modify The Discovery Schedule And Motion For Class Action Briefing Schedule**

Plaintiffs have moved to modify the discovery schedule and the briefing schedule for the motion for class certification in anticipation of receiving relief on their renewed motion to compel. Although CMIC initially opposed this motion, it now acknowledges that some

extension of the deadlines will be necessary to permit plaintiffs' experts to incorporate the additional XactAnalysis data that CMIC and Verisk will produce. (Dckt. #179 at 4 n.6.) Given the relief provided to plaintiffs and the timeframe within which CMIC and Verisk have to produce the additional data, the Court adjusts the discovery schedule and briefing schedule as follows. Fact discovery will remain open until February 16, 2021 for the limited purpose of addressing the matters discussed in this decision. Plaintiffs' Rule 26(a)(2) disclosures are due on March 16, 2021 and the depositions of plaintiffs' experts are to be completed by April 20, 2021. CMIC's Rule 26(a)(2) disclosures are due on May 18, 2021 and the depositions of CMIC's experts are to be completed by June 22, 2021. Plaintiffs' motion for class certification is due on July 27, 2021, CMIC's response is due on August 31, 2021, and plaintiffs' reply is due September 28, 2021.

**CONCLUSION**

For the above reasons, plaintiffs' renewed motion to compel (Dckt. #160) is granted in part and denied in part. CMIC is ordered to produce the revised "Storm meeting notes – March 2010" document to plaintiffs by February 5, 2021. CMIC and Verisk are further ordered to produce the XactAnalysis waste data identified above in Section A(1)(a) to plaintiffs by February 16, 2021. Plaintiffs' motion to modify the discovery schedule and the class action briefing schedule (Dckt. #175) and plaintiffs' motion for leave to file a short document addressing representations in defendant's supplemental memorandum (Dckt. #180) are granted.

**ENTERED:   February 2, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**